# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-1957V**

DANIEL WOLFE,

Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

Chief Special Master Corcoran

Filed: May 1, 2025

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Jamica Marie Littles, U.S. Department of Justice, Washington, DC, for Respondent.*

## FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING TABLE CLAIM[1]

On October 4, 2021, Daniel Wolfe filed a Petition under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"); *see* Section 11(c)(1)(D)(i). Petitioner alleges that he suffered brachial neuritis[3] following his receipt of

[1] Because this opinion contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] Brachial neuritis has several synonyms including Parsonage-Turner syndrome, brachial plexus neuropathy, neuralgic amyotrophy, idiopathic brachial plexus neuropathy, brachial plexitis, and brachial plexopathy. *See, e.g.*, *Madan v. Sec'y of Health & Hum. Servs.*, No. 19-537V, 2023 WL 3946834, at *2 (Fed. Cl. Spec. Mstr. May 16, 2023). Several of these alternate terms appear in Mr. Wolfe's medical records. This opinion consistently utilizes the term brachial neuritis, consistent with the Table definition.

a tetanus toxoid-containing vaccine on October 4, 2018. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

After review of the record and the parties' arguments, I conclude (under the Act's more likely than not standard) that Petitioner developed new pain in the affected arm and shoulder within twelve (12) hours after his tetanus vaccination, mandating dismissal of his Table claim (although an off-Table claim might be feasible).

## I. Procedural History

In March 2022, the claim was assigned to the SPU (OSM's forum for claims that have typically not required extensive litigation). ECF No. 9. The next month during an initial status conference, Petitioner's prior counsel[4] was offered an introduction to the Vaccine Program. ECF No. 12. Petitioner was also ordered to file certified and unredacted copies of his medical records, which were entered on May 4, 2022. ECF No. 13.[5]

On September 12, 2022, Respondent filed his Rule 4(c) Report formally opposing compensation – particularly contending that "Petitioner's records, including his own reports, document the onset of left shoulder pain and symptoms *within hours* of his October 2018 receipt of the Td vaccination," and hence too soon to meet the Table's timeframe for such a claim. Rule 4(c) Report, ECF No. 12 at 12. Petitioner then retained current counsel. ECF No. 19.

On June 23, 2023, Petitioner confirmed that he was maintaining a Table claim, and the parties agreed to brief the disputed onset issue for my resolution. ECF No. 22. Over subsequent months, Petitioner fell out of communication with the Durant firm and considered switching legal representation again, and he was ordered to show cause why his claim should not be dismissed for failure to prosecute. *See generally* ECF Nos. 23 – 29. On March 11, 2024, Petitioner confirmed that he was maintaining representation by the Durant firm, and the parties proposed a schedule for briefing onset, which was accepted. ECF No. 30; *see also* Brief filed May 10, 2024, ECF No. 31); Response filed

---

[4] Petitioner was represented by Kimberly Johnson until December 2022. ECF No. 19. This case's docket indicates that Ms. Johnson moved from a private law firm to the Vermont Attorney General's Office.

[5] Petitioner did not file the requested motion to strike the previous versions of his medical records, which remain on the docket. This opinion utilizes Petitioner's refiled medical records at Exhibits 2 – 4, and 6 – 7 (ECF No. 13) as well as his originally-filed affidavit at Ex. 5 (ECF No. 7-1).

It is further noted that Petitioner incorrectly labeled Exhibit 7 (ECF No. 13-5) as Exhibit *6.* This opinion utilizes the correct exhibit number. (In contrast, Respondent refers to the filing as "Ex. 6 (SVMC)," *see* Rule 4(c) Report at n. 1.)

July 9, 2024, ECF No. 32; Reply filed Sept. 3, 2024, ECF No. 34. The matter is ripe for adjudication.

## II. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs*., 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[6] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). At issue here is the listing for brachial neuritis with an onset between 2 – 28 days, i.e., *not less than 2 days* and not more than 28 days, after receipt of a tetanus toxoid vaccine. 42

[6] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

C.F.R. § 100.3(a)(I)(B). The corresponding Qualifications and Aids to Interpretation ("QAI") for a Table brachial neuritis injury are as follows:

> Brachial neuritis… is defined as dysfunction limited to the upper extremity nerve plexus (i.e., its trunks, divisions, or cords). A deep, steady, often severe aching pain in the shoulder and upper arm usually heralds onset of the condition. The pain is typically followed in days or weeks by weakness in the affected upper extremity muscle groups. Sensory loss may accompany the motor deficits, but is generally a less notable clinical feature. Atrophy of the affected muscles may occur. The neuritis, or plexopathy, may be present on the same side or on the side opposite the injection. It is sometimes bilateral, affecting both upper extremities. A vaccine recipient shall be considered to have suffered brachial neuritis if such recipient manifests all of the following:
>
> (i) Pain in the affected arm and shoulder is a presenting symptom and occurs within the specified time-frame;
>
> (ii) Weakness;
>
> (A) Clinical diagnosis in the absence of nerve conduction and electromyographic studies requires weakness in muscles supplied by more than one peripheral nerve;
>
> (B) Nerve conduction studies (NCS) and electromyographic (EMG) studies localizing the injury to the brachial plexus are required before the diagnosis can be made if weakness is limited to muscles supplied by a single peripheral nerve.
>
> (iii) Motor, sensory, and reflex findings on physical examination and the results of NCS and EMG studies, if performed, must be consistent in confirming that dysfunction is attributable to the brachial plexus; and
>
> (iv) No other condition or abnormality is present that would explain the vaccine recipient's symptoms.

42 C.F.R. § 100.3(c)(6).[7]

---

[7] I am resolving Petitioner's claim on the filed record. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers where (in the exercise of their discretion) they conclude that doing so will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The

## III. Evidence

I have reviewed all of the filings submitted by both parties to date. The below summary focuses on the disputed onset issue.

**Medical Records.** Petitioner was 48 years old when he received the tetanus vaccine in his left arm on October 4, 2018. His medical history included anxiety, depression, low back pain, and a suspected peripheral neuropathy in his hands and feet. He was taking Valium and gabapentin, and was unemployed and on Medicaid. *See generally* Ex. 7 at 102 – 63.

Petitioner also had a history of shoulder pain and dysfunction, particularly on the right side. *See* Ex. 7 at 109 (listing a right rotator cuff strain in 1995); *id.* at 4 – 8 (July 2015 urgent care encounter for right shoulder pain with no known cause); *id.* at 29 – 34 (July 2016 urgent care encounter for right shoulder arm/neck/pain following a motor vehicle accident); *id.* at 41 – 55 (December 2016 urgent care encounters for chest pain radiating into his arms). But in the year prior to the at-issue vaccination, his primary care records suggest *left* shoulder pain – with no corresponding examination or assessment. *Id.* at 102 – 06, 131 – 33, 142 – 45.

On Thursday, October 4, 2018 in the late morning,[8] Petitioner attended a primary care annual evaluation. He reported: “Lots of aches and pains. Same aches that he has had previously. Knees, back left shoulder.” Ex. 7 at 164. However, there is no corresponding exam or assessment, and the problem list included the *right* shoulder. Ex. 7 at 164 – 65. The at-issue tetanus vaccine was at this time administered in Petitioner’s left deltoid. *Id.* at 169.[9]

---

decision to rule on the record in lieu of hearing has been affirmed on appeal. *Kreizenbeck v. Sec’y of Health & Hum. Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020); *see also Hooker v. Sec’y of Health & Hum. Servs.*, No. 02-0472V, 2016 WL 3456435, at *21 n. 19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided cases on the papers in lieu of hearing and that decision was upheld). I am simply not required to hold a hearing in every matter, no matter the preferences of the parties. *Hovey v. Sec’y of Health & Hum. Servs.*, 38 Fed. Cl. 397, 402 – 03 (1997) (determining that special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417; *Murphy v. Sec’y of Health & Hum. Servs.*, No. 90-0882V, 1991 WL 71500, at *2 (Fed. Cl. Spec. Mstr. Apr. 19, 1991).

[8] A licensed practical nurse checked in Petitioner and reconciled his medications by 10:36 a.m. Ex. 7 at 166. A nurse practitioner signed the annual examination record at 12:43 p.m. *Id.* at 170.

[9] Additionally on October 4, 2018, an influenza (“flu”) vaccine was administered in Petitioner’s right deltoid, Ex. 7 at 169, but the Petition and medical records do not suggest any injury stemming from that second vaccine.

Two days later – October 6, 2018 – at 12:01 p.m., Petitioner was admitted to an emergency room for an initial diagnosis of "severe left chest pain." Ex. 3 at 20. At 12:04 p.m., registered nurse Kathleen Cloud recorded: "Patient got tetanus booster Thursday, **began that evening to left arm with muscle spasming radiating to left side of neck and left armpit**." *Id.* at 21 (emphasis added). Petitioner rated his current pain at 10/10. *Id.*

At 12:43 p.m., a second registered nurse, Aubrey Davis, recorded that Petitioner was resting on a stretcher, in no acute distress. Ex. 3 at 22. Petitioner "state[d] he received a tetanus injection on Thursday and **later that evening, he began to have what he describes [as] 'muscle spasms.'**… describes a constant burning sensation that travels up into his left neck and down into his left chest wall… unable to lift arm due to brain and spasms… pain causes him to lose his breath." *Id.* (emphasis added).

Afterwards,[10] the attending emergency medicine physician met with Petitioner and recorded the following history:

> This is a generally healthy 48-year-old man who presents to the emergency department with post-vaccination pain involving the left side of his neck, his entire left hemi-thorax and his left arm. He received influenza vaccination in his right arm and tetanus vaccination in his left arm on Thursday at his primary care office. **By later that night, he was feeling tired and started having pain in his left arm and left side of his neck. Since then he has had persistent severe pain. He was not able to sleep last night.** He tells me that any movement of his arm or neck aggravates this pain. Coughing or taking a deep breath aggravates it as well. He does have a history of asthma and is also a smoker. He seems to have a chronic baseline discomfort in that area described which is acutely worsened at times randomly, but can be triggered by movement or coughing. When that happens, the pain becomes a severe, searing, sharp discomfort that affects the entire area. He describes this as a 'spasm.'

Ex. 3 at 13 (emphasis added).

[10] *See* Ex. 3 at 22 (reflecting that the registered nurse notified the emergency medicine physician at 12:45 p.m., and he entered Petitioner's room by 12:47 p.m.).

Petitioner submitted to a physical examination and tests including laboratory studies, EKG, cardiac markers, and a CT angiogram of the neck. Ex. 3 at 18, 24 - 25. He displayed a "very good response" to intravenous Toradol and Decadron, and oral Valium. *Id.* at 18, 25 – 26.

The emergency medicine physician noted that Petitioner had "present[ed to the] emergency department 2 days after receiving a tetanus vaccination. **Since then, he has had progressively worsening pain symptoms** with a neuropathic character involving the territory of the left brachial plexus and also including portions of the left chest wall." Ex. 3 at 18 (emphasis added). While the emergency evaluation found "no evidence of a cardiac, respiratory, or central neurological cause of his symptoms," the physician considered that the "location of his symptoms and the proximity to his vaccination… would be compatible with [brachial neuritis]." *Id.* The physician believed that Petitioner's symptoms were "related to an inflammatory condition that might be related to" his vaccination. *Id.* Petitioner was discharged home with impressions of "severe post-vaccination neuropathic pain" and "suspect[ed]" brachial neuritis, to be managed with gabapentin (Neurontin) and over-the-counter non-steroidal anti-inflammatory medications ("NSAIDs"). *Id.* at 18, 26 – 27.

On October 7, 2018, a hospital nurse called to follow up on Petitioner's condition. Ex. 3 at 24. He reported ongoing "spasming" and "tingling numbness." *Id.* at 24. Later that month, a primary care provider ("PCP") recorded Petitioner's history of: "Reaction to tetanus shot. **Thursday night following injection increased pain, swelling left arm, pain spread down left arm, ribs sore, not using left arm at all, burning tingling pain.**" Ex. 3 at 69 (emphasis added). The "impression" contains similar details, except for suggesting that the tetanus vaccination had been "the day before reaction." *Id.* at 71. Petitioner was instructed to manage his pain with heat, ice, and ibuprofen. *Id.*

At a November 5, 2018 primary care follow-up, Petitioner had decreased strength; decreased range of motion; pain in his left shoulder radiating all the way down his arm; burning and tingling upon making a fist; discomfort in his ribs; and soreness in his neck. Ex. 3 at 73 – 74. Petitioner had been taking Valium and gabapentin, and he rated the current pain at 8/10. *Id.* The PCP recommended a neurology evaluation of possible brachial neuritis. *Id.* at 75.

Between December 2018 and June 2019, Petitioner followed up regularly with his PCP for his alleged vaccine injury. The records do not shed further light on onset, but they document an ongoing left shoulder injury suspected to represent brachial neuritis (or complex regional pain syndrome, *see* Ex. 3 at 86) which warranted a neurology consult. Petitioner also described difficulties with health insurance, transportation, family

obligations, anxiety, depression, and an intervening pneumonia infection. *See generally* Ex. 3 at 77 – 101 (PCP records); *see also id.* at 37 – 61 (December 2018 emergency visit for pneumonia).

At the June 14, 2019 neurology initial evaluation, Petitioner reported that "his problems began" with his October 2018 annual exam and tetanus vaccination. Ex. 4 at 56. **"Later in the day, he had an uncomfortable feeling in his arm, but noted that he was warned that this is to be expected. However, over the next two days, his pain progressed. He initially noted discomfort underneath his left armpit, followed by discomfort down his left arm, followed by tingling and numbness of his whole arm…** [B]ecause of the pain, discomfort, and cramping he sought evaluation in the emergency department… [W]hile there, he was having contractions of his left upper extremity that were extremely vigorous in nature… so bad that they would essentially train [sic?] him and… he had no ability to do anything else." *Id.* (emphasis added). A physical exam and EMG of Petitioner's left upper extremity were limited by his significant pain, but suggestive of nerve dysfunction consistent with brachial neuritis mainly in the upper trunk. *Id.* at 59 – 60, 67. The neurologist recommended additional diagnostic lab work and MRIS of his neck and plexus, and entered a referral to pain management. *Id.* at 60,

At the July 2, 2019, pain management initial evaluation, Petitioner reported: "In October 2018 he had **onset of pain in the left upper extremity following a tetanus booster… over the 2 days following his visit, he had pain under the left arm in axilla, pain shooting down the left arm, and tingling and numbness of his whole arm…** He was seen in the emergency department… for this issue as he has having severe spasms and pain… this has been ongoing since October 2018." Ex. 4 at 29 (emphasis added). The record further states: "Sudden onset. Since onset pain is unchanged. Location: Left neck, left arm and left hand. Duration: 9 months." *Id.* The pain was currently 8/10, and ranged from 7 – 10/10. *Id.* Based on the history, EMG findings, and her own physical examination of Petitioner, he the pain management provider assessed that Petitioner "had some components of" chronic regional pain syndrome ("CRPS"), his signs and symptoms could "somewhat be explained by" brachial neuritis. *Id.* at 38. She suggested further evaluation (including the previously suggested MRIs), following up in six weeks, and taking Lyrica and naltrexone for the pain. *Id.*

Between October 2019 – September 2021, Petitioner followed up several times with his PCP. These records suggest that Petitioner's left upper extremity injury was ongoing, but he received no further evaluation by any specialists (e.g., neurology, pain management, MRIs) despite the PCP's repeated urging. *See generally* Ex. 3 at 102 – 120.

**Petitioner's Affidavit.** In October 2021, Petitioner states that three years earlier: "During the evening of October 4, 2018, I started to feel some fatigue and minor pain in my left arm. On October 6, 2018, two days after my vaccine, I went to the [emergency room] for a significant aggravation of my symptoms. I had severe pain in my left neck, shoulder, chest, armpit, and arm. I had muscle spasms in my left upper arm, and I had tingling and numbness down my entire left arm into my left hand." Ex. 5 at ¶¶ 5 – 6.

Petitioner's affidavit also suggests that his pre-vaccination history included a left rotator cuff tear in 2016, and a further left-sided injury during a motor vehicle accident later in 2016. Ex. 5 at ¶ 8. But in April 2022, the parties were informed that my preliminary review did not identify any corresponding records. ECF No. 12 at 1. In June 2022, Petitioner confirmed that "all pre-vaccination medical records, and any other evidence pertaining to any potential left shoulder injury before the vaccination, ha[d] been filed" and that the only rotator cuff tear and traumatic injuries were on his *right* side. ECF No. 15.

## IV. Analysis

A Table brachial neuritis injury requires proof of new shoulder and arm pain and dysfunction beginning not less than two days after receipt of a tetanus vaccine. 42 C.F.R. §§ 100.3(a)(I)(B), (c)(6).

Respondent argues that in this case, "Petitioner's records, including his own reports, document the onset of left shoulder pain and symptoms *within hours*" after the vaccination. Rule 4(c) Report at 12; *accord* Response at 11. Petitioner responds that his medical records and affidavit establish *two* distinct and unrelated types of pain: 1) "initial discomfort within hours of his tetanus vaccination (fatigue, minor left arm pain) consistent with the common side effects of tetanus vaccine"[11]) and 2) "severe neuropathic pain symptoms reach[ing] a crescendo at the two-day mark post-vaccination, which is consistent with the Table timeframe for the onset of brachial neuritis." Brief at 16; *accord* Reply at 6 – 7 (internal citations omitted). Respondent opposes any "dissection of [Petitioner's] pain into different stages and/or types." Response at 13.

Here, the record does not support Petitioner's arguments distinguishing his initial pain from what came later. For example, the emergency medicine physician described "two kinds of pain," in the following initial notation: "[L]ater that night, [Petitioner] was feeling tired and started having pain in his left arm and left side of his neck. Since then [Petitioner] has had persistent severe pain." Brief at 15, citing Ex. 3 at 13. But that

[11] In support of this proposition, Petitioner's Brief at n. 2 cites to a Centers for Disease Control and Prevention ("CDC") webpage which I could not access.

physician *also* recorded that Petitioner's pain was significant enough to disrupt his sleep the night before his emergency room presentation. *Id.* And after further evaluation, the same physician summarized that "since then [the vaccination,] [Petitioner] had suffered "progressively worsening pain symptoms with a neuropathic character." *Id.* at 18. The physician's *only* assessment was of a post-vaccination brachial neuritis, and he *did not endorse* any distinguishable preceding pain.[12]

In addition, several other medical providers independently recorded that Petitioner had experienced *significant* left shoulder/arm/neck pain and "spasming" beginning on the night of the vaccination. Ex. 3 at 21 – 22 (hospital nurses); *id.* at 69 (PCP). Later records indicate that his "pain progressed, "over the next two days" leading up to his emergency room visit. Ex. 4 at 56, 29. These records support the conclusion that the providers viewed the overall progression of symptoms as being consistent with brachial neuritis.

Within Mr. Wolfe's medical records, certain wording (e.g., "since" vaccination) is admittedly vague. But as I previously observed, even when claimants employ "imprecise terminology in describing to treaters when symptoms began . . . terms like 'since' or 'shortly after' are reasonably understood by the special master to mean *very* close in time." *Flowers v. Sec'y of Health & Hum. Servs.*, No. 20-285V, 2024 WL 2828211, at *11 (Fed. Cl. Spec. Mstr. May 8, 2024), *mot. for rev. den'd*, 173 Fed. Cl. 613 (2024). "[I]ndeed, in the context of [SIRVA claims], a patient's reports of pain conveyed with similarly non-specific language are *consistently* interpreted to mean within 48 hours of vaccination." *Id*.[13] A contrary interpretation is not warranted simply because a different Table injury (brachial neuritis) that requires a more delayed onset is at issue.

---

[12] The emergency medicine physician's additional note of a "chronic baseline discomfort in that area," aggravated by movement, is ambiguous – potentially referring either to Petitioner's pre-vaccination aches and pains" apparently including in the left shoulder, or to the suspected brachial neuritis. Ex. 3 at 13.

[13] Citing *O'Leary v. Sec'y of Health & Hum. Servs.*, No. 18-584V, 2021 WL 3046617, at *10 (Fed. Cl. Spec. Mstr. June 24, 2021); *Williams v. Sec'y of Health & Hum. Servs.*, No. 17-1046V, 2020 WL 3579763, at *5 (Fed. Cl. Spec. Mstr. Apr. 1, 2020) (holding that "based on the record as a whole, I find the notations characterizing onset as 'since,' 'after receiving,' 'following,' and 'very soon after' injection are best understood as indicating onset was effectively immediate, or within 48 hours of vaccination").

*See also, e.g.*, *Kallin v. Sec'y of Health & Hum. Servs.*, No. 20-0113V, 2024 WL 5135419, at *6 (Fed. Cl. Spec. Mstr. Nov. 12, 2024) (accepting that the petitioner's shoulder injury began immediately upon vaccination, and progressed over time leading up to her first formal medical evaluation); *Robuck v. Sec'y of Health & Hum. Servs.*, No. 20-0465V, 2023 WL 6214986, at *5 – 6 (Fed. Cl. Spec. Mstr. Aug. 21, 2023) (reports of shoulder pain "following the flu shot" and "since… flu shot a few weeks ago" supported a finding of onset within 48 hours post-vaccination); *Smith v. Sec'y of Health & Hum. Servs.*, No. 20-0300V, 2023 WL 6620362, at *4 (Fed. Cl. Spec. Mstr. Feb. 24, 2023) ("when [the petitioner] received [the at-issue vaccine,]" "after receiving a tetanus injection"); *Hunt v. Sec'y of Health & Hum. Servs.*, No. 19-1003V, 2022 WL 2826662, at *6 (Fed. Cl. Spec. Mstr. June 16, 2022) (shoulder pain "from" and "beg[inning] after she received a flu shot").

Petitioner correctly notes (Brief at 16) that the Federal Circuit has held that "sworn testimony as to facts within [a] witness's personal knowledge" can constitute objective evidence. *James-Cornelius v. Sec'y of Health & Hum. Servs.*, 984 F.3d 1374, 1380 (Fed. Cir. 2021). Petitioner's affidavit is thus entitled to *some* consideration – but its probative value is somewhat limited because it was prepared three years after the events in question. Additionally, Petitioner's affidavit (describing only "minor" left arm pain the night of the vaccination, followed by a "significant aggravation" and emergency evaluation within two days post-vaccination) *conflicts* with the contemporaneous medical records (evidencing more significant pain the night of the vaccination, which further progressed in intensity, eventually prompting his emergency evaluation).[14] I reasonably give the medical records more weight.

**Conclusion and Scheduling Order**

For the foregoing reasons, Petitioner more likely than not experienced the onset of new pain involving his left arm and shoulder on the evening of October 4, 2018 – within roughly twelve (12) hours of receipt of the tetanus vaccine. That onset is inconsistent with a Table brachial neuritis claim, which must be dismissed.

An off-Table claim based on these same facts, however, *might* be feasible – although it will face other challenges. Having reviewed the file for purposes of this onset determination, I recognize Respondent's additional argument that there is "not evidence confirming" the alleged brachial neuritis. Rule 4(c) Report at 12; *accord* Response at 15 – 16. But the *available* evidence contains repeated consideration of brachial neuritis as being the best explanation for Petitioner's post-vaccination injury, and numerous explanations for Petitioner's failure to seek further evaluation (e.g., his unemployment, and healthcare access through Medicaid). It is also emphasized that Petitioner not only bears the burden of establishing the alleged injury, but a showing of vaccine causation-

[14] This case's evidence is distinguishable from that in *Davis*, in which the special master found that an initial *lack* of contemporaneous medical records, plus affidavits from the petitioner and ten other fact witnesses, were sufficiently consistent, clear, cogent, and compelling to outweigh later medical records which suggested an onset not fitting the Table brachial neuritis timeframe. *Davis v. Sec'y of Health & Hum. Servs.*, No. 16-0276V, 2016 WL 6471911 (Fed. Cl. Spec. Mstr. Oct. 7, 2016), cited in Brief at 17.

Petitioner's reliance on *Jones* is not particularly helpful because that litigation did not center on understanding the onset of pain, but rather, a differential diagnosis including thoracic outlet syndrome. *Jones v. Sec'y of Health & Hum. Servs.*, No. 04-1147V, 2006 WL 2052379 (Fed. Cl. Spec. Mstr. July 5, 2006), cited in Brief at 18 – 19.

in-fact based on the onset described herein. No experts have been authorized in the case to date.[15]

The parties are instructed to promptly explore the potential for informal resolution of Petitioner's remaining claim, to include the previously-acknowledged Medicaid lien.[16] If the parties cannot report a tentative settlement agreement within 60 days, the case will be transferred out of SPU for further proceedings.

**Accordingly within 60 days, by no later than Monday, June 30, 2025, Petitioner shall file a Joint Status Report updating on the case,** unless a 15-Week Order has been requested by that deadline.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[15] *See* SPU Initial Order entered Mar. 18, 2022, ECF No. 10, at 1 (stating that no expert should be retained in a case assigned to SPU without prior consultation with the opposing party and the Court, and that engaging experts is not routine in SPU cases).

[16] *See* Petitioner's Status Report filed June 13, 2022, ECF No. 15 at 2.